UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                  Plaintiff,

     v.

JAMES WALTON,

                  Defendants.
_____

REPORT & RECOMMENDATION

17-CR-6079W

## PRELIMINARY STATEMENT

By Order of Hon. Elizabeth A. Wolford, United States District Judge, dated August 22, 2017, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 23).

On August 22, 2017, the grand jury returned a two-count indictment against defendant James Walton.  (Docket # 22).  Count One of the indictment charges Walton with bank fraud, in violation of 18 U.S.C. § 1344.  (*Id.*).  Count Two charges Walton with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  (*Id.*).  Both offenses are alleged to have occurred between January 2011 and December 2014.  (*Id.*).

Currently pending before the Court are Walton's motions to dismiss Count One as duplicitous[1] and to suppress statements.[2]  (Docket ## 40, 47).  For the reasons discussed below, I recommend that the district court deny Walton's motions.

---

[1] Walton maintains that Count Two, which is based upon the allegations of Count One, should also be dismissed in the event Count One is dismissed.  (Docket # 40 at ¶ 22).

[2] Walton's omnibus motion also sought, *inter alia*, disclosure of Rule 404, 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 40).  Each of the motions was decided by the undersigned or resolved by the parties in open court on April 18, 2018.  (Docket ## 42, 43).

# REPORT AND RECOMMENDATION

## I. Dismissal of Count One

Walton moves to dismiss Count One of the indictment on the grounds that it is duplicitous. (Docket # 40). Count One charges that Walton engaged in a scheme to defraud two financial institutions, Tompkins Bank of Castile and M&T Bank ("the Banks"). (Docket # 22 at 2, ¶ 2). According to the indictment, Walton was employed by an owner of various rental properties. (*Id.* at 1, ¶ 1). Walton's duties included processing tenants' requests for refunds of their security deposits. (*Id.* at 2, ¶ 3). The security deposit refund checks were drawn on accounts held with the Banks. (*Id.* at 1-2, ¶ 2).

The indictment charges that Walton obtained the security deposit checks, forged the tenants' signatures, and negotiated the checks for his own benefit, resulting in a total loss of $41,781.81. (*Id.* at 3, ¶ 3). Count One contains a table reflecting 97 checks alleged to have been fraudulently negotiated by Walton, including the alleged date of the check, amount of the check, initials of the payee, and the identity of the Bank on which the check was drawn. (*Id.* at 3-7, ¶ 4). Count One charges that "[i]t was part of the scheme and artifice that . . . Walton forged and fraudulently negotiated" the 97 checks identified in the table. (*Id.*).

"An indictment is invalidly duplicitous when it joins in a single count two or more distinct, separate offenses." *United States v. Droms,* 566 F.2d 361, 363 (2d Cir. 1977). A count should be found duplicitous only when "the policy goals underlying this doctrine are offended, *i.e.,* 'if a general verdict of guilty might actually conceal findings as to different alleged crimes, or if an appropriate basis for sentencing is not provided.'" *United States v. Parker*, 165 F. Supp. 2d 431, 447 (W.D.N.Y. 2001) (quoting *United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981)). Duplicity is a rule of pleading, and its violation does not warrant

dismissal. *United States v. Droms*, 566 F.2d at 363 n.1 (citing *Reno v. United States*, 317 F.2d 499, 502 (5th Cir.), *cert. denied*, 375 U.S. 828 (1963); 1 C. Wright, *Federal Practice and Procedure*, § 142, 311 (1969)). Rather, an appropriate remedy would be to require the government, prior to trial, to elect between the duplicitous charges. *United States v. Parker*, 165 F. Supp. 2d at 451. As the Second Circuit has explained, "[t]he law does not . . . absolutely proscribe duplicitous pleading because it recognizes that such an inflexible rule could inure to defendants' detriment by 'requir[ing] exposure to cumulative punishments.'" *United States v. Walker*, 254 F. App'x 60, 62 (2d Cir. 2007) (quoting *United States v. Margiotta*, 646 F.2d at 733).

Walton argues that Count One is duplicitous because it charges 97 negotiations in a single count, as opposed to 97 separate counts. (Docket # 40 at ¶¶ 17-22). Walton maintains that Count One, as charged, creates a risk that the jury could return a general guilty verdict premised on nonunanimous findings as to which checks Walton negotiated. (*Id.* at ¶ 21). Walton also argues that Count One, by alleging "a single overarching scheme, runs the risk that the jury could convict without unanimously agreeing on the elements of the crime." (*Id.*). Finally, Walton contends that if the jury were unable to reach a general verdict, he could be retried with respect to all the checks even though the jury might have agreed that he had not negotiated certain of the checks. (*Id.*).

Contrary to Walton's arguments, I do not find Count One to be duplicitous. Allegations of bank fraud involving a single scheme affecting multiple financial institutions and involving multiple negotiations may properly be charged in a single count. *United States v. Walker*, 254 F. App'x at 62 ("we do not perceive any duplicity in Count One of the indictment [involving 'multiple banks and multiple executions'], which on its face charged a single scheme

and which the government argued as such"); *United States v. Klein*, 2004 WL 1191962, *4 (S.D.N.Y. 2004) (rejecting duplicity challenge to single bank fraud charge where court directed government to identify each allegedly fraudulent check, the alleged co-conspirators, the businesses, the bank accounts, and the financial institutions; "[t]he acts that allegedly constituted this scheme may properly be charged in a single count, even if it was possible to charge them separately, so long as they are part of the continuing course of conduct") (citing *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990)); *see also United States v. King*, 200 F.3d 1207, 1211, 1213 (9th Cir. 1999) (rejecting duplicity challenge to single bank fraud charge that involved negotiation of multiple checks drawn on multiple closed accounts at Canadian bank; "while these independent acts probably *could* constitute separate offenses, Count One alleges a single execution of the fraudulent scheme [and] . . . is not duplicitous").

Relying on *United States v. Harris*, 79 F.3d 223, 232 (2d Cir. 1996), Walton maintains that the Second Circuit requires that each execution of a fraudulent scheme must be charged in a separate count. (Docket # 40 at ¶ 17 ("the bank fraud statute is designed to punish each separate execution of the scheme 'rather than each act in furtherance of such a scheme'") (quoting *United States v. Harris*, 79 F.3d at 232)). *Harris*, which dealt with multiplicity – not duplicity – does not stand for this proposition. *See Harris*, 79 F.3d at 232. Rather, it holds that each execution of a fraudulent scheme *may* permissibly be charged in a separate count. *Id.*; *see also United States v. Bruce*, 89 F.3d 886, 889 (D.C. Cir. 1996) ("we think the sensible answer [to the question 'whether an act which *can* be viewed as independent execution of scheme *must* be charged in a separate count in order for the charge not to be duplicitous'] is that the two are *not* mutually exclusive; certain situations would justify indictment either in one count or in separate

counts"). Here, the government has elected to charge in one count a single scheme to defraud the Banks by negotiating multiple tenant deposit refund checks. That decision does not violate the policies served by the doctrine on duplicity. *See Walker*, 254 F. App'x at 62; *United States v. Klein*, 2004 WL 1191962 at *4.

Any concerns that Count One presents a risk of a nonunanimous verdict may be addressed through an instruction to the jury that its verdict must be unanimous with respect to particular transactions when "multiple transactions serve as the basis for a fraud conviction." *See Walker*, 254 F. App'x at 62 (emphasizing "'sound practice' of charging unanimity with particularity when multiple transactions serve as the basis for a fraud conviction") (internal quotation omitted); *Klein*, 2004 WL 1191962 at *5 ("any concern about the jury's unanimity regarding the specific checks can be cured, if the defendants so request, by a special interrogatory . . . or a special instruction regarding the unanimity requirement for each false check"). For these reasons, I recommend that the district court deny Walton's duplicity challenge to Count One.

## II. Suppression of Statements

### A. Testimony of Gregg Steven Horner

On May 16, 2018, over the government's objection, this Court conducted an evidentiary hearing on Walton's motion to suppress statements. (Docket # 44). The government called retired Federal Bureau of Investigation ("FBI") Agent Gregg Steven Horner ("Horner") to testify. (Tr. 2-64).[3] Horner testified that he had retired in March 2018, after working as a special

---

[3] The transcript of the evidentiary hearing shall be referred to as "Tr." (Docket # 51).

agent for approximately twenty-two years. (Tr. 2-3). In 2016, Horner was assigned to the Frederick Resident Agency of the Baltimore Division of the FBI, located in Maryland. (Tr. 3).

According to Horner, fellow FBI Agent Alicia Wojtkonski received a request from the FBI's Buffalo Division to interview Walton. (Tr. 3-4, 57). On June 15, 2016, Wojtkonski, accompanied by another FBI agent, left a card with her contact information at Walton's home. (Tr. 4). Walton telephoned Wojtkonski and agreed to meet her at his residence on July 22, 2016, at 5:30 p.m., a date and time suggested by Walton. (Tr. 4-5, 41-42). At Wojtkonski's request, Horner accompanied her to the interview. (Tr. 4). Horner had not met Walton before the interview and had not participated in the investigation leading to the interview. (Tr. 4-5).

Horner met Wojtkonski at Walton's residence. (Tr. 5-6, 20). Dressed casually with their firearms concealed, they knocked on his door. (Tr. 6). Horner answered and asked Wojtkonski to move her car to a designated visitor parking space. (Tr. 20-21). Walton then invited the agents into his house, and they followed him to the kitchen. (Tr. 6, 21, 54). Horner was unaware whether anyone else was in the residence. (Tr. 21). Horner recalled that Walton's dogs were present and that the agents petted them and briefly conversed with Walton about them. (Tr. 7). At some point, Walton removed them from the kitchen, but Horner could not remember what prompted their removal. (Tr. 7, 30).

Horner testified that Wojtkonski took the lead in questioning Walton, although he asked some questions during the interview. (Tr. 7, 21). Wojtkonski began by asking Walton whether he had lived and worked in Rochester, New York, and explained that he was being investigated for embezzlement. (Tr. 7-8, 35). Although Horner recalled the general order of the interview topics and the sum and substance of the interview, he was often unable to recall the

specific or verbatim questions and answers or which agent asked a particular question. (Tr. 35-41, 43).

At some point during the interview, Wojtkonski showed Walton copies of checks with his signature that she had been provided by the New York case agent. (Tr. 7-8). She also showed him bank statements reflecting the deposits of those checks into Walton's account. (Tr. 8). Horner testified that Walton initially denied knowing why his signature was on the checks. (Tr. 9). After further discussion about the processing of security deposit checks, and Walton's review of bank statements and documents relating to a $11,000.00 check, the interview returned to the checks that Walton had denied signing. (Tr. 9-10, 37-40, 43-44, 55). Walton inquired, "What happens if I talk?" (Tr. 10, 44).

According to Horner, the agents explained "the variety of things that could happen from . . . nothing to him[,] an arrest warrant being issued for him[,] to him being able to come to . . . Rochester with an attorney and meet with the agent and the prosecutor." (Tr. 10, 45-47). The agents advised Walton that, based on their experience, "if you're cooperative, things generally get better for you." (Tr. 49). At that point, Walton stated, "I did it," and proceeded to make various alleged admissions. (Tr. 10, 51-52). The interview concluded when the agents felt that they had obtained the information they needed. (Tr. 10-11, 51, 53). Walton indicated that he planned to go to New York in August and would arrange to meet with the authorities at that time. (Tr. 11, 47).

According to Horner, the interview was "amicable." (Tr. 8). At no time during the interview did the agents threaten Walton, raise their voices, display their firearms, or indicate that he was not free to terminate the interview. (Tr. 8-9). Walton did not appear intoxicated, ill,

7

nervous, or afraid, although he did express concern about his wife finding out what he had done. (Tr. 9, 11, 57). The interview lasted approximately one hour. (Tr. 11-12).

Prior to his testimony, Horner refreshed his recollection of the interview by speaking to Wojtkonski and reviewing her reports. (Tr. 13-15; Defendant's Exhibits ("D. Exs.") A and B). The interview was not recorded, and Horner did not take any notes. (Tr. 21-22, 33-34).

### B. Walton's Affidavit

Walton submitted an affidavit in support of his motion. (Docket # 40-1). According to Walton, "[v]ery soon into the questioning, [he] was made to feel that [he] had no choice but to answer their questions" and "was made to feel that [he] could not leave or end the questioning." (*Id.*). Walton also asserted that neither of the agents advised him of his constitutional rights. (*Id.*).

### C. Discussion

Walton contends that his statements were obtained in violation of the Fifth Amendment because he was subjected to custodial interrogation without being advised of or validly waiving his *Miranda* rights. (Docket # 40 at ¶¶ 8-16). The record makes clear that Walton was not advised of his *Miranda* rights prior to being interrogated by Horner and Wojtkonski on June 22, 2016; thus, the salient question is whether Walton was in custody at the time of the interrogation. (Docket # 52 at 6).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

In determining whether a defendant was in custody, a court must undertake a two-part analysis. *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018). First, the court must ask whether "a reasonable person in the defendant's position would have understood that he or she was free to leave." *Id.*; *see United States v. Newton*, 369 F.3d 659, 672 (2d Cir.), *cert. denied*, 125 S. Ct. 371 (2004). If the answer is affirmative, the inquiry concludes. *United States v. Newton*, 369 F.3d at 672. If, however, the reasonable person would not have felt free to leave, the court must then proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, "there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d at 60.

"Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Newton*, 369 F.3d at 672 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave"). Thus, "[a]lthough

9

both elements are required, the second is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized[,] . . . a necessary, but not sufficient, condition [of custody]." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal quotations omitted). Considerations relevant to the second inquiry include "whether the suspect [was] told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject [was] searched or frisked, and the length of the interrogation." *Santillan*, 902 F.3d at 60.

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

Horner testified credibly about the circumstances under which Walton answered the agents' questions. Horner and Wojtkonski met with Walton at his home at a time agreed to

by Walton. Both agents were dressed in plainclothes, and neither displayed a weapon. After requesting that Wojtkonski move her car, Walton invited them into his home and spoke with them in his kitchen.

The agents advised Walton that he was being investigated for embezzlement and confronted him with documents, including checks and bank statements. Neither agent administered *Miranda* warnings, raised their voice, threatened Walton, or told him that he had to answer their questions. When Walton inquired what would happen to him, the agents described various scenarios, but did not make any assurances about the outcome and indicated that the prosecuting authorities in New York would make that determination. At the conclusion of the interview, Walton indicated that he would contact the authorities in New York, and the agents left his residence.

As an initial matter, I do not find that a supplemental hearing to permit Walton to present the testimony of Agent Wojtkonski is warranted.[4] Walton argues that Horner's failure to remember various details of the interview justifies continuing the hearing to require testimony from the only other agent present during the interview. (Docket ## 47 at ¶ 25; 52).

That Horner was unable to recall many of the specific questions and answers, verbatim responses, or the identity of the agent who asked a particular question is not uncommon, particularly more than two years after an interview. Nothing more than speculation supports the suggestion that Wojtkonski – who, like Horner, was an agent in a different field office from the one conducting the investigation and had not participated in the investigation –

---

[4] To the extent that Walton's motion seeks an order compelling the government to provide certain alleged *Brady* material relating to Horner (Docket # 52 at 1-2), this Court has already considered that request and denied it without prejudice. (Docket # 50 at 17). Insofar as he seeks to recall Horner "following disclosure of Brady materials" (Docket # 52 at 1), that request is premature; the defendant has not identified any *Brady* information relevant to Horner's testimony that it did not possess during his previous testimony.

11

would have a sharper recollection of the interview. Moreover, having carefully reviewed Horner's testimony, I find that he was able to testify about the circumstances of their interview with sufficient detail, clarity, and assurance to enable the Court to confidently resolve the question of custody. On this record, the testimony of Wojtkonski likely would be cumulative. *See*, *e.g.*, *United States v. Macklin*, 902 F.2d 1320, 1329 (8th Cir. 1990) (holding defendant has no absolute right to production of a witness absent a showing "that the testimony of the witness sought would be both material and favorable"), *cert. denied*, 498 U.S. 1031 (1991); *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (denying request for testimony of other officers present during interview on the grounds that the testimony would likely be cumulative; "when the government produces sufficient evidence through witnesses that a defendant's confession was given freely, voluntarily and knowingly, this court declines to adopt a rule requiring that the testimony be presented of all individuals present at the time a confession is given"), *cert. denied*, 459 U.S. 1117 (1983); *United States v. Valencia-Romero*, 748 F. Supp. 64, 65 (E.D.N.Y. 1990) (declining to require testimony from every agent present during interview on grounds testimony would be cumulative; defendant must offer "'some reasonable' basis to believe that the testimony would be beneficial to his case," and "[u]nbridled speculation falls far short of this standard").

Horner's credible testimony summarized above establishes that Walton was not in custody during the questioning by the agents and that his statements were voluntary. *See United States v. Mitchell*, 966 F.2d at 98-99 (defendants were not in custody during interviews at their residences; "the entire interview occurred in the familiar surroundings of [defendant's] home"); *United States v. Schliebener*, 2013 WL 5936665, *3 (W.D.N.Y. 2013) (defendant not in custody when interviewed at his residence by uniformed officer; "a reasonable person would have

understood that they were free to stop answering questions and either re-enter their house, or ask [the officer] to leave"), *aff'd*, 632 F. App'x 28 (2d Cir. 2016); *United States v. Titemore*, 335 F. Supp. 2d 502, 507 (D. Vt. 2004) (defendant was not in custody when questioned on the deck of his residence where officer did not tell defendant that he was not free to leave, use restraints or brandish his weapon, and where officer left the residence without arresting defendant), *aff'd*, 437 F.3d 251 (2d Cir. 2006). Accordingly, I recommend that the district court deny Walton's motion to suppress his statements.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny Walton's motions to dismiss and to suppress statements. (Docket ## 40, 47).

**IT IS SO ORDERED.**

            *s/Marian W. Payson*
            MARIAN W. PAYSON
            United States Magistrate Judge

Dated: Rochester, New York
      October 22, 2018

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                                                *s/Marian W. Payson*
                                                              MARIAN W. PAYSON
                                                            United States Magistrate Judge

Dated: Rochester, New York
       October 22, 2018

---

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).